**UNITED STATES OF AMERICA, ex rel.**
**JAN WATFORD-GRANGER and**
**PATRICK CONLISK,**

      **Plaintiffs/Relators,**

**v.**

**MEDICAL SERVICES OF AMERICA, INC.,**
      **a South Carolina corporation, and**
      **Florida foreign corporation,**

      **Defendant.**
_____/

## SECOND AMENDED QUI TAM COMPLAINT
## PURSUANT TO 31 U.S.C. §§ 3729-3733
## THE FEDERAL FALSE CLAIMS ACT
## FOR TREBLE DAMAGES AND EQUITABLE RELIEF

Plaintiffs, United States of America ex rel. Jan Watford-Granger and Patrick Conlisk, by and through the undersigned attorney sues Defendant, Medical Services of America, Inc., a South Carolina corporation, and Florida foreign corporation, d/b/a MSA Home Health, Community Home Health, Medi Home Health Agency, and Medi Home Care (hereinafter "MSA"), and states:

## I.    INTRODUCTION

1.    Plaintiffs bring this action to recover treble damages of $3,137,623.00, civil penalties of not less than $10,781.00 per false claim, totaling $10,349,760.00, and for other monetary and equitable relief available, pursuant to the False Claims Act 31 U.S.C. §§ 3729-3733 (hereinafter "FCA").

2.    This Second Amended Qui Tam Complaint relates to Defendant, MSA's violations of 31 U.S.C. § 3729, excerpted in pertinent part, to wit:

§ 3729 (a)(1) (A)  knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval (Count 1-Count 320, inclusive);

§ 3729 (a)(1) (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim (Count 321-Count 640, inclusive);

§ 3729 (a)(1) (C)  conspires to commit a violation of subparagraphs (A), (B), ...or (G) (Count 961); and

§ 3729 (a)(1)(G)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decrease an obligation to pay or transmit money or property to the Government (Count 641-Count 960, inclusive).

3.     Relators  aver that presently, and prior to commencement of Discovery in this case, Relators  are in possession of MSA patient source documentation that evidence 960  false  claims  act  violations  committed  by MSA,  identified with specificity in the Appendix 6-Matrix  hereto, related  to 320 separately   referenced  false  and  fraudulent  plan  of  care  certifications  and  re-certifications (CMS Form 485s),  used  by  MSA  as "on file" patient  file documentation, required by federal law as a pre-requisite, to finally bill Medicare for listed patients' home health care services.  Further, the final Medicare billing for these 320 patient episodes, dependent upon  false certifications within CMS Form 485s,   created  320 separate obligations to repay Medicare for provisional advanced  payments  received  by  MSA from Medicare for these patient episodes for which MSA was not entitled. Lastly, these same false and fraudulent plan of care certifications CMS Form 485s  represent false records or statements material to false or fraudulent claims, within the meaning of § 3729 (B), supra. Hence, one single false plan of care certification or re-certification results in three separate false claims act violations, as averred herein.

4.     The patient file source documents  referenced in Appendix 6-Matrix  have been

numerically numbered with a Bates Stamped Numbering System, and have been previously provided by Relators to Defendant, MSA in Rule 26 Disclosures made. The informational data contained in Appendix 6-Matrix hereto, referencing patient files and specifically CMS Form 485 original source documents, by Bates Stamped Numbered reference, and pertaining to specific averments made herein by episode number 1-320 referenced in Appendix 6-Matrix, are hereby incorporated by specific reference into the body of this Second Amended Complaint, as though those original source documents, and billings documents referenced, were fully set forth herein, or appended hereto.

5. Request For Anticipated Payment (hereinafter "RAP") summaries for the period 1/1/2008-1/31/2012 titled "Billed RAP Report" comprising 996 pages has been previously provided in full to Defendant, MSA in Rule 26 Disclosures made. Appendix 6-Matrix contains excerpted line item RAP information for patient episodes referenced in Appendix 6-Matrix, excerpted from this Billed Rap Report summary, identified here by specific reference. Relators hereby incorporate by specific reference MSAs "Billed RAP Report", as excerpted in Appendix 6 for specific patient episodes, as though that original 996 page original source document titled "Billed Rap Report 1/1/2008-1/31/2012" were fully set forth herein, or appended hereto.

## II.     JURISDICTION AND VENUE

6. This action arises under 31 U.S.C. § 3729, et seq. Pursuant to 31 USC § 3730, a private person may bring a civil action for a violation of § 3729 for the person and for the United States. This Court possesses subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732 (a) because the defendant resides or transacts business in this

district. All procedural pre-requisites required before the initial filing of this action have been met by Relators.

7.     Venue is proper in this district under 31 U.S.C. § 3732 and 28 U.S.C. § 1391 (b) and (c)  because at least one of the defendants resides or transacts business in this district, and because the claims arose in this district.

## III.     THE PARTIES

8.     Jan Watford-Granger is a resident of Lawrenceville, Gwinnett County, Georgia, and was employed as a Regional Director of  Defendant from approximately September, 2010 through and including, December, 2012.

9.      Patrick Conlisk is a  resident of Flagstaff, Coconio County, Arizona, and was employed as a Director Of Professional Services of Defendant from approximately 4/6/12 through 5/10/13.

10.     Medical Services of America, Inc. is a Florida foreign corporation with  corporate headquarters located in Lexington, South Carolina.  MSA is a comprehensive home  healthcare provider that offers home healthcare, hospice service, durable  medical equipment, and  other services.   At all times material hereto MSA maintained and owned locations across the country in Florida, Georgia, Indiana, Kentucky, Maryland, Nevada, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia. At all material times, MSA conducted business in the Southern, Middle and Northern Districts of Florida. All  MSA  employees named in this Second Amended Complaint acted within the scope of their respective employments with MSA, and had actual or apparent authority from MSA to do the acts complained of within the scope of the services provided to MSA as employees of MSA.

## <u>ALLEGATIONS COMMON TO ALL COUNTS</u>

### IV.    THE MEDICARE PROGRAM

11.    In 1965, Congress enacted Title XVIII of the Social Security Act [hereinafter "Medicare" or the "Medicare program"] to pay for the costs of certain health services and health care.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. <u>See</u>  42  U.S.C. §§ 426, 426A-1.

12.    Medicare consists of two separate programs, Parts A and B.  Part A provides insurance for  certain elderly  or disabled persons to cover the costs of inpatient hospital care, nursing facility care, home health services, and hospice care. See generally 42 U.S.C. §§ 1395c to 1395i-5. Part B is a voluntary program that provides supplemental benefits to elderly or disabled Medicare participants to cover the costs of, among other things, physician services, laboratory and diagnostic tests, ambulance services, and prescription drugs. See generally §§ 1395j to 1395w-4.  See <u>Fischer v. United States,</u> 529 U.S. 667, 683-684, 120 S. Ct. 1780, 1790, 146 L. Ed. 2d 707,  (2000).

13.    The Medicare Part B medical insurance program for the aged covers a part of the cost of certain physicians' services,  outpatient physical therapy, and other medical and health care.  See 42 U.S.C. § 1395k (2010).  The  program supplements the Medicare Part A hospital insurance plan, § 1811 et  seq. of the Social Security Act of 1935, 49 Stat. 620, as added, 79 Stat. 291, and as amended, 42 U.S.C. § 1395c et seq. (2010),  and  it is financed in equal parts by the United States and by monthly premiums paid by individuals aged 65 or older who choose to enroll. 42 U.S.C. § 1395r(b) (2010).  See generally <u>Mathews v. Diaz,</u> 426 U.S. 67, 70,  96 S. Ct. 1883, 1887, 48 L. Ed. 2d 478 (1976).

14.    Title 42 U.S.C. § 1395o (2010) provides, in pertinent part:

"Every individual who (1) is entitled to hospital insurance benefits under part A, or (2) has attained age 65 and is a resident of the United States, and is either (A) a citizen or (B) an alien lawfully admitted for permanent residence who has resided in the United States continuously during the 5 years immediately preceding the month in which he applies for enrollment under this part, is eligible to enroll in the insurance program established by this part."
42 U.S.C. s 1395o (2010)

15.     Since Medicare is a cost reimbursement system, a Medicare Provider cannot lawfully bill Medicare for services that were not performed, were not medically necessary (See 42 U.S.C. § 1395y(a) (1) (A); See 42 U.S.C. § 1320c-5(a) (1)), See also 42 CFR 411.15(k) (1)), or were billed in violation of federal law, or Medicare guidelines. Moreover, effective March 23, 2010, knowingly failing to return an overpayment to Medicare specifically became an 'obligation' to pay money to the government for purposes of 31 U.S.C. § 3729 (a)(1)(G), and upon which a false claims act violation would lie. See 42 U.S.C. § 1320a-7k(d) (March 23, 2010)

## V.     PALMETTO GBA:

16.     For all times material to this Second Amended Complaint, Palmetto GBA, headquartered in Columbia, South Carolina, was awarded the contract from the Centers For Medicare & Medicaid Services ("CMS") and administered Part A and Part B Medicare fee-for-service claims in Florida on behalf of Medicare, including Home Health Care claim administration, under Medicare Part A. As such, Palmetto GBA, Columbia, South Carolina, as a contractually appointed Agent of CMS, a received electronic claims for payment from MSA, Lexington, South Carolina, processed claims for payment received from MSA, Lexington, South Carolina, and paid MSA, Lexington, South Carolina for claims made, via electronic funds transfer or ACH funds transfer to MSA, Lexington, South Carolina.

## VI.     HOME HEALTH CARE REGULATIONS, CLAIMS, AND CERTIFICATIONS:

17.     Effective on or after May 23, 2007, all home health care providers, including Defendant, MSA, were required to use CMS Forms titled "UB 04 CMS 1450", or an electronic equivalent, related to fee for service home health care (hereinafter "HHC") claims made to Medicare's fiscal Agent, Palmetto GBA.

18.     CMS Form 1450 [Appendix 1] contains a Certification, excerpted in pertinent part as follows:

> "UB 04-NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETAR[]Y PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

> Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:
> ...

> **3.     Physician's certifications and re-certifications [CMS Form 485s], if required by contract or Federal regulations, are on file.**
> ..."

UB 04 CMS 1450 [Appendix 1, p. 2][Emphasis added]

19.     True, accurate and complete physician's certifications and re-certifications of patient's plans of care (hereinafter "CMS Form 485" or "POC") are required to be "on file" in a HHC patient file, in order to evidence medical necessity, compliance with Medicare regulations, and compliance with federal laws related to home health services rendered; and as mandatory pre-requisites for lawful final billing and reimbursement under the Medicare Program Part A for home health care services.

20.     Truthful certifications and re-certifications must be 'on file' in a HHC patient's medical file, a pre-requisite to billing Medicare, for every single 60 day episode billed. To the extent the certifications and re-certifications do not exist, or are false, the HHC cannot lawfully finally bill Medicare under federal law, and any provisional advance payments received from Medicare related thereto, become an 'obligation' to repay the United States money that was received without entitlement.

21.     42 C.F.R. § 424.22 (2010) (Appendix 2) mandates that treating physician certifications (for initial plans of care) and re-certifications (for subsequent plans of care) exist in a patient's file for that particular 60 day episode; sets forth the text of the certifications and re-certifications to be made by the treating physician; and states in the introductory paragraph that Medicare *only* pays for Medicare Part A or Part B if a physician certifies and re-certifies the content specified therein. 42 C.F.R. § 424.22 (2010) (Appendix 2), See also 42 U.S.C. § 1395f(a)(2)(C), See also Title 18 § 1814 Social Security Act, subsections (2)(C).

22.     Without these mandatory certifications and re-certifications Medicare cannot determine medical necessity, without which payments can never be authorized or paid under the Medicare Program by federal law.

23.     Medicare requires that a treating physician of a HHC patient personally sign these certifications and re-certifications, because as a treating physician that person is the only person that could truthfully attest to the information required therein.

24.     To the extent *a physician* signed a certification or re-certification, notwithstanding that the physician had no doctor-patient relationship with that particular patient, that certification or re-certification would be false on it's face, because it would be impossible for just any physician to

attest to the plan of care for a patient that the physician never met, treated, or diagnosed.

25.     Additional Medicare requirements for certification or re-certification by treating physicians of their patients being vetted for home health care were added effective January 1, 2011. On or after January 1, 2011, the same treating physician responsible for performing the certification or re-certification of a HHC patient must also document that a face-to-face patient encounter [hereinafter "face to face" or "F2F"], which is related to the primary reason the patient requires home health services, has occurred no more than 90 days prior to the home health start of care date or within 30 days of the home health care start of care date, determined by the date of the encounter listed. See 42 C.F.R. 424.22 (a)(v) (effective January 1, 2011).

26.     As such, the existence of a valid F2F form signed by the treating physician of a HHC patient must also be "on file" as a material pre-requisite to a latter truthful certification or re-certification by a treating physician of that same patient's plan of care for each 60 day certification period. The truthful certification or re-certification by a treating physician of a patients plan of care, CMS Form 485, then becomes a pre-requisite to lawfully finally billing Medicare for that patient episode, via a subsequent billing Certification made on UBO4 CMS Form 1450 (Appendix 1); 42 C.F.R. 424.22 (a)(v); Medicare Benefit Policy Manual, Chapter 7 HHC, § 30.5.1.

27.     Federal law prohibits a physician who has a compensation arrangement, or direct or indirect employment relationship with a HHC from ever signing a certification or re-certification to be relied upon used as "on file" supporting documentation, or justification, for finally billing Medicare at the conclusion of a patient's 60 day episode for any reason. Moreover, on or after January 1, 2011 a physician who has a compensation arrangement with the HHC is specifically prohibited from signing the same HHC's patient's F2F. 42 C.F.R. § 424.22 (d)(1) (2010)(Appendix

2)(physician that has a financial relationship with the HHA prohibited from certifying or re-certifying need for home health services to be provided by that same HHC), See also 42 U.S.C. §1395f (a)(2)(a physician "who does not have a direct or indirect employment relationship with the facility" must certify and re-certify), See also Title 18 § 1814 (2) (a physician "who does not have a direct or indirect employment relationship with the facility" must certify and re-certify).

28.    A Medical Director of a HHC that is financially compensated by the HHC for services rendered cannot lawfully sign certifications, re-certifications, or F2F forms for that same HHC's patients, to be used by the HHC as "on file" documentation supporting medical necessity, for certification of compliance to Medicare, or for Medicare billing, related to that falsely certified or re-certified HHC patient's 60 day plan of care. 42 C.F.R. § 424.22 (d)(1)

29.    Notwithstanding, a Medical Director of a HHC could never truthfully sign a certification, re-certification or F2F document related to a HHC's patient, regardless of the monetary prohibition, because that Medical Director is not the treating physician of the HHC's patient, has never treated or diagnosed that patient, and has absolutely no personal relationship with that patient.

30.    Medical Directors of HHCs that sign these mandatory forms are doing so simply because the HHCs cannot bill Medicare without this source documentation "on file", and chances are since these forms are merely maintained in the HHC's patient file, they will not be caught.

31.    A Medical Director of a HHC is not legally authorized to institute plan of care, changes it, modify it, insert addendums to it, order medications, etc...for the same reason that the Medical Director cannot institute an original plan of care–they are not the treating physician of the patient and are being financially compensated by the HHC merely for signing documents

necessary for Medicare billing purposes. This scenario leads to Medicare fraud, up-coding, services provided that are not medically necessary, and services provided to patients that do not initially qualify, or re-qualify for home health care. That is the harm feared by Medicare and the reason these mandatory pre-requisites and billing requirements for home health care are required by federal law.

32.    To the extent a HHC Medical Director signs certifications and re-certifications so that a HHC can finally bill Medicare, and keep advance provisional payments received from Medicare for that patient's 60 day episode, those documents are false and/or fraudulent on the face of those documents for these reasons: a.) financial compensation to the Medical Director prohibits the Medical Director from signing these documents for the HHC for Medicare billing purposes; b.) the Medical Director is not a treating physician of the HHC patient and therefore falsely certifies or re-certifies the medical necessity for services and treatments listed in the HHC plan of care being signed; and c.) the manner in which the certifications or re-certifications are signed implies that the Medical Director of the HHC may in fact work in the treating physician's office, due to the fact that the Medical Director is signing these forms underneath the treating physician's signature block, see infra, Appendix 4, lines 24, 27.

33.    A "Home Health Care Certification And Plan Of Care" certification or re-certification CMS Form 485 contains the following oath:

> "26.    I certify/re-certify that this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy. **The patient is under my care**, and I have authorized the services on this plan of care and will periodically review the plan." CMS Form 485, ¶ 26. [Emphasis added]

> "28.    Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws." CMS Form 485, ¶ 28

34.     The truthful certifications and re-certifications mandated by 42 C.F.R. § 424.22, 42 U.S.C. § 1395f, and Title 18 § 1814 of the Social Security Act, are the same truthful certifications and re-certifications required by UB 04 CMS Form 1450, and CMS Form 485 as pre-requisites for finally billing Medicare for a HHC's patient's 60 day episode plan of care treatments, and for keeping provisional advance payments made by Medicare to the HHC for that plan of care episode; e.g provisional payments made prior to the final billing based upon RAPs dropped.

35.     Medicare guidelines permit a HHC to bill Medicare provisionally prior to the final billing to Medicare for a home health care patient's 60 day episode by billing Medicare with a Request For Anticipated Payment (hereinafter "RAP" or "provisional payment" or "advance payment"). Once that RAP is dropped electronically it is paid within a few days.

36.     When Medicare receives a RAP from a HHC (for Florida that is Medicare's Agent, Palmetto GBA) it automatically pays up front, 60% of the anticipated final billing to the HHC, based upon diagnoses and treatments cited in the patient's *initial* plan of care (un-certified) being billed for advance provisional payment; or 50% in the case of a patient being re-certified for a subsequent plan of care. The HHC receives this provisional advance payment from Medicare within a few days after the RAP is dropped by electronic funds or ACH transmission to the HHC. This provisional payment received by the HHC can become an 'obligation' to repay Medicare for purposes of 31 U.S.C. § 3729 (a)(1)(G) to the extent that the final billing for that same patient episode is not in compliance with Medicare's Certification mandates required for final billing. Medicare's provisional advance RAP payment scheme is essentially an honor system payment.

37.     The RAP Medicare billing made by the HHC provisionally is conditioned on the fact that the final billing made for that particular patient is lawful and contains, or will contain, truthful

billing certifications, and truthful "on file" certifications, re-certifications, and F2F documentation evidencing medical necessity for home health care provided, prior to the HHC's final billing to Medicare for a patient's 60 day episode.

38.     A final Medicare billing is then made by the HHC to collect the outstanding 40% of the initial billing, or 50% with respect to patients that were re-certified into subsequent plans of care; as adjusted for additional or less services and/or treatments administered during the 60 day episode that differ from those stated in the RAP previously billed to Medicare at the onset of the episode. Additional services or treatments can be Ordered by an attending physician after the initial RAP is dropped on Medicare, and Medicare will pay additional monies for additional treatments or services Ordered, and adjust the patient's initial plan of care accordingly, increasing the final payment to the HHC, from the remaining balance due just based upon the initial RAP dropped.

39.     When a false HHC certification or re-certification is made by a physician and is used as the basis for a final HHC billing to Medicare at the conclusion of a patient's 60 day episode: a.) the actual final billing becomes a false claim for payment or approval; b.) the actual false certification or re-certification made (or false F2F made a material part thereof) becomes a false record or statement material to a false or fraudulent claim; and c.) the false certification or re-certifications evidences that the provisional RAP payment should never have been paid to the HHC provisionally, because the HHC was not entitled to that payment. Moreover, the creation of the false record or statement (CMS Form 485) is created in an attempt to improperly avoid or decrease an obligation to pay or transmit money or property to the Government, e.g. the provisional payment received for that same patient episode.

40.     Although failing to repay an 'obligation' to the United States has been a part of the

federal false claims act for many years (31 U.S.C. § 3729 (a)(7) "knowingly makes, uses, or causes

to be made or used, as false record or statement to conceal, avoid, or decrease an obligation to pay

or transmit money or property to the Government..") in effect prior to May 20, 2009, Congress

clarified the meaning of 'obligation' for purposes of § 3729 (a)(1)(G) by specifically defining the

term "overpayment" regarding Medicare payments made, as follows: " The term "overpayment"

means any funds that a person receives or retains under sub-chapter XVIII or XIX to which the

person, after applicable reconciliation, is not entitled under such sub-chapter.." 42 U.S.C. § 1320a-7k

(4)(B)(Effective March 23, 2010). Moreover, the definition of "overpayments", as defined in 42

U.S.C. § 1320a-7k (4)(B) was specifically subsumed into the definition of "obligation" as defined

in 31 U.S.C. § 3729 (b)(3) for purposes of false claims act enforcement. Failure to repay a known

obligation to the United States is commonly referred to as a reverse-false claim, because it can

necessitate the return of any funds received from the United States for which the recipient is not

entitled.

  41. As such, one such false certification or re-certification POC or CMS Form 485 in the

health care industry results in three (3) separate FCA violations.

## VII. BATES STAMPED NUMBERED DOCUMENTS AND APPENDICES

  42. As part of Plaintiffs' Rule 26 Initial Disclosures, Bates Stamped Documents #200-

#1267 inclusive, and Request For Anticipated Payment (hereinafter "RAP") summaries for the

period 1/1/2008-1/31/2012 titled "Billed RAP Report" comprising 996 pages were provided to

Defendant, MSA. Copies of all other material source documents in Relators' possession were also

provided to Defendant, MSA. Bates Stamped Numbered Documents, or any other MSA original

source documents, are not appended to this Second Amended Complaint by agreement with

Counsel for Defendant that bulk patient file source documents would be incorporated by specific reference into this Second Amended Complaint by, as if fully set forth herein, or appended hereto.

43.     Relators also hereby incorporate by specific reference Appendices #1-#5, attached hereto, as if the information contained in Appendices #1-#5 were fully set forth within the body of this Second Amended Complaint.

44.     Specifically, the Bates Stamped numbered documents referenced in Appendix #6-Matrix represent a partial summary of information contained within the original MSA patient source documents referenced, and from which Appendix 6 was drafted. Appendix 6 was drafted for the purpose of summarizing material allegations data from original source documents in a concise format, so that those voluminous source documents would not need to be appended directly to this pleading, while meeting the specificity requirements of this pleading.

## SPECIFIC ALLEGATIONS OF FRAUD AND FCA VIOLATIONS

## VIII.   KRISTY MAGEE MD FALSE CERTIFICATIONS MADE FOR MSA BILLING

45.     On or after May 1, 2010, Defendant, MSA, Administrator, Donna Smargon, directly or indirectly hired Kristy MaGee, MD to act as a Medical Director of MSA, Winter Park Florida Office.

46.     Kristy MaGee, MD, an outside physician in practice in the Orlando vicinity, was compensated by MSA at the rate of $250 per hour for work performed as evidenced in monthly invoices to MSA beginning in May, 2010 and continuing through at least November, 2011 (Appendix 3); although Ms. MaGee's signature appears on CMS 485 documents dated into 2012.

47.     Kristy MaGee, MD was compensated by MSA at the rate of $250 per hour for, inter

alia, reviewing MSA -Winter Park Office patient files, signing certifications and re-certifications for MSA patient plans of care billed to Medicare and for signing modification Orders for MSA patient plans of care. (Appendix 3) (See all related monthly invoice references for traveling to Winter Park Office for reviewing patients plans of care and signing orders, or similar references).

48.     Kristy MaGee, MD was not the primary physician for any of the patients that she signed certifications or re-certifications or modification Orders for, never diagnosed or treated those patients, had no doctor-patient relationship with those patients, and never had any personal encounter with those patients.

49.     Kristy MaGee, MD's primary role for MSA was to sign stacks of paper so that MSA could have certifications and re-certifications [and on information and belief, including, F2F forms for a portion of 2011], merely so that MSA could have some physician's signature "on file" to bill Medicare.

50.     Kristy MaGee, MD signed certifications and re-certifications when MSA, for whatever reasons, could not get treating physicians to sign certifications and re-certifications for their patients, authorizing particular 60 day episodes of care. MSA's reasons are irrelevant; this procedure was unlawful. These unlawful acts were knowingly committed by MSA for Medicare billing purposes.

51.     Kristy MaGee signed numerous modification Orders for MSA patients, increasing treatments, increasing skilled visits, increasing therapy visits, and increasing frequency of medication doses administered, and changing patient diagnoses for Medicare billing purposes, that Ms. MaGee had no legal authority to sign, thereby increasing final billing payments due to MSA for those patients being finally billed to Medicare.

## IX. DETAILED EXAMPLE OF MSA FALSE CERTIFICATION SCHEME

52.     Appendix 4 represents a false re-certification (CMS Form 485) example for MSA patient E.U., for plan of care episode- certification period 10/10/10-12/8/10, and also evidencing an unsigned Addendum thereto.  (See also Appendix 6, p. 17, reference number 99).

53.     Relators are in the possession of  320 such false certifications or re-certifications (Appendix 6-Matrix), which all bear the signature of Kristy MaGee, MD, as Medical Director of MSA, as opposed to these patient's treating physicians' signatures, required by federal law. These are all false CMS Form 485 certifications or re-certifications and are all substantially similar in all material respects to the CMS Form 485 example appended hereto. (Appendix 4, infra).

54.     Appendix 4 contains the following material informational and certification items, which are used by Medicare to determine E.U.'s medical necessity for home health care:

a.      The HHC Patient's Medicare Recipient ID Number, without which no Medicare billing can occur;

b.      The start of care date, which states the date when E.C. first started home health with MSA; in this case E.U. started on 12/14/09;

c.      The certification period 10/10/10-12/8/10 is the 60 day episode for E.U.  In this particular certification period, Medicare was billed twice by MSA, once for  the  initial RAP billing, in which Medicare paid 50%  provisionally during the start of E.U.'s plan of care, and the second time for the final billing submitted to Medicare, after  the certification date signed by Kristy MaGee in item 27, which states 12/29/10. This one false re-certification amounts to three separate FCA violations, as previously described;

d.      Item D is the internal MSA patient file number utilized by MSA that is also be used internally by MSA to identify patient E.U.;

e.      Item E is MSAs Medicare Provider ID Number, which acts to direct payments to the correct provider, in this case MSA;

f.      Item F is the diagnosis and coding section of the form, which identifies which

codes to be billed to Medicare on UB 04 CMS 1450 for patient E.U. for this episode. The diagnosis section and codes must be completed by E.U.'s treating physician (these were not completed by E.U.'s treating physician);

g.    Item G is a listing of medications that E.U. is taking, in relation to the diagnoses stated in item F. This section must also be completed by E.U.'s treating physician (these were not completed by E.U.'s treating physician);

h.    Item H is a listing of durable medical equipment that E.U. needs during this plan of care episode, also to be completed by E.U.'s treating physician (these were not completed by E.U.'s treating physician);

i.    Item I are the Orders For Care And Discipline section, which are supposed to be completed by E.U.'s treating physician, otherwise it is impossible to determine, with certainty or even accuracy, whether these Ordered treatments, skilled visits, and other discipline Orders are medically necessary for E.U. or not (these were not completed by E.U.'s treating physician);

j.    Item J. Goals/Rehabilitation Potential/Discharge Plans section again is supposed to be completed by E.U.'s treating physician, otherwise there is no control of E.U.'s planned end date and E.U. can go on indefinitely in home care (these were not completed by E.U.'s treating physician);

k.    Item K is the signature of the MSA Administrator Donna Smargon, RN;

l.    Item L is the date that the HHC received POT, in E.U.'s case this is blank, because MSA did not receive E.U.'s plan of treatment (aka "POC") from a treating physician, it simply created this document internally at MSA;

m.    Item M. identifies E.U.'s treating primary care physician with specificity (this treating physician is supposed to review all data on this Form 485 and sign it, after comparing the data contained therein to E.U.'s patient charts in the treating physician's office, which is a material step for Medicare's determination and reliance of medical necessity);

n.    Item N. is the Certification required by 42 C.F.R.§ 424.22, 42 U.S.C. § 1395f, and Title 18 § 1814 (2) of the Social Security Act. Item N is a false re-certification, and false record because it was not signed by Doctor Robert Clement or another authorized person at Doctor Clement's Office. Hence, this re-certification is false;

o.    Item M is the signature of Kristy MaGee, MD, MSA Medical Director. Dr.

MaGee's re-certification of E.U. is false (additionally, the signature block is drafted in such a manner that the reader is intentionally misled into believing that Dr. MaGee is a physician employed by the treating physician Dr. Clement, and merely signed "for" Dr. Clement, as is customarily accepted in many other industries, but never permissible in home health care);

p.    Item N is the warning to anyone who falsely signs E.U.'s re-certification. This warning was ignored by MSA Administrator Donna Smargon and Dr. Kristy MaGee;

q.    Item Q is to highlight the diagnosis of "low vision", which appears as a diagnosis code for most of (on information and belief more than 90% of) MSA Winter Park Florida patients, regardless of whether those patients have low vision or not, during the years approximately 2010-2012 (up-coding averments are made in a specific up-coding section, infra); and

r.    Item R represents an unsigned Addendum to E.U.'s plan of care, that was not signed by any physician, not even Kristy MaGee, MD. This unsigned Addendum to the re-certification of E.U. is false because it is not signed by E.U.'s treating physician, and because the POC Addendum is a material part of the re-certification of E.U. on page 1 of the CMS Form 485 for this episode billed to Medicare. (Without a signature and date it can be randomly changed out by MSA for final billing purposes at a later date.)

55.    Kristy MaGee admitted to Relator, Jan Watford-Granger that the patients for whom she signed Form 485 certifications and re-certifications were not under her care. Dr. MaGee further admitted to Relator, Jan Watford-Granger that she was instructed by MSA to sign Forms 485 as the attending physician even though she was not.

56.    Upon discovering the false certifications and re-certifications made to Medicare by Defendant, MSA, Relator, Jan-Watford Granger, brought them to the attention of MSA Administrator Donna Smargon, and others, and urged MSA to advise Medicare of these false certifications and re-certifications, and to repay Medicare for overpayments related thereto. MSA refused to do so.

57.    Appendix 5, pps. 1-5, illustrate MSA's billing processes, collection processes,

profit and loss statement per episode, an example of Bates Stamped Documents references, and a summary table related to pertinent CMS Form 485 information excerpted from Appendix 6, episode reference number 99, for E.U.'s certification period 10/10/10-12/8/10, to wit:

a.  Appendix 5, Page 1, first printed line item, as excerpted from Defendant, MSA's RAP provisional advance payment received from Medicare for E.U.'s episode summaries, details specifics regarding the RAP that MSA billed to Medicare during the initial start of care for patient E.U. E.U. is identified by MSA file number 217469 for that specific 60 day episode. The initial RAP billing was made to Medicare on or after 10/31/10, as authorized by Medicare regulations as a provisional advance payment, and Medicare paid approximately 50% of $3,741.12, or $1,870.56 to MSA, Lexington, South Carolina, within a few days thereafter, by electronic funds or ACH transmission. [Note: Had E.U. been an initial certification period as opposed to a re-certification period, Medicare would have paid 60% of $3,741.12 or $2,244.67 provisionally and prior to E.U.'s final billing for this 60 day episode].

b.  Appendix 5, page 1, line items 2-3 references certain information ( excerpted from the CMS Form 485, see Appendix 4) related to the re-certification of MSA patient E.U. for the re-certification period 10/10/10-12/8/10, to wit: E.U.'s treating physician is identified as Robert Clement, MD. E.U.'s re-certification was signed by Kristy MaGee, MD. This re-certification was signed on 12/29/2010, but was not signed by E.U.'s treating physician Robert Clement, MD. The Bates Number references for E.U. here are identified as Bates Numbered pages 1070-1076, as previously provided to Defendant, MSA's Counsel for reference purposes;

c.  Appendix 5, pages 1-2, identifies specific time periods that MSA billed Medicare related to E.U.'s plan of care period 10/10/10-12/8/10. The provisional billing, or RAP

for 50% of $3,741.12 was billed to Medicare on or after 10/31/10 (as specifically identified by the RAP summary data excerpted), and was paid by Medicare within a few days thereafter. The final billing for E.U. was billed to Medicare on or after the date signed by Kristy MaGee 12/29/10, and was paid by Medicare within a few days after that date billed.

      d.    Appendix 5, page 3 is an excerpt from Appendix 3, evidencing that on 12/29/10 Kristy MaGee billed MSA for services rendered on that date including the signing of E.U.'s re-certification - Appendix 4. Note that on 12/29/10 Kristy MaGee billed MSA for 2.5 hours at the rate of $250 per hour.

      e.    Appendix 5, page 4, as appended to Kristy MaGee's December, 2010 invoice to MSA, states that in December, 2010, Kristy MaGee "reviewed the following plans of care/orders..." including file number 217469, which is MSA patient E.U.'s file. This excerpt also reveals that on the same date Kristy MaGee reviewed a total of 39 MSA files, which means that Kristy MaGee spent approximately 3.85 minutes for each file, as a total of 2.5 hours was billed for work performed on 12/29/10.

      f.    Appendix 5, page 5, is an MSA billing and accounting reference for MSA patient E.U.'s plan of care period 10/10/10-12/8/10 that indicates a total of $3,741.13 was paid by Medicare to MSA for E.U.'s episode, that MSA's cost was $1,950.00, and that MSA's profit was $1,791.13, or 47.8% for it's treatment of E.U. for this episode.

      g.    Relators are in possession substantially similar original source documentation for hundreds of other MSA patient episodes , that include specific Kristy MaGee, MD billing invoices referencing patient files by number, as the documentation presented in Appendices 4-5 for patient E.U. All this documentation was previously provided to Defendant, MSA in Rule 26

Disclosures.

## X.    APPENDIX 6- MATRIX CERTIFICATION FRAUD SUMMARY EPISODES #1-#320

58.    Appendix 6-Matrix  is a 55 page summary of false certifications and re-certifications made by Kristy MaGee, MD on behalf of MSA for purposes of billing Medicare, broken down by patient episode for false 485s  in Relators' possession. As previously stated, all of the original source documents referenced in Appendix 6 have been provided to Defendant, MSA prior to the filing of this Second Amended Complaint.

59.    Each separate patient episode is broken down by "False  CMS  485  Episode Reference #"  in Appendix 6 for episode  reference numbers: # 1-#320, inclusive. There are a total of 320 patient 60 day episodes referenced in Appendix 6-Matrix, which include  dollar  amounts  falsely and fraudulently billed to Medicare for these episodes respectively, that totals $1,045,874.33 as singular damages. (Appendix 6, p. 55)

60.    Appendix 6 paragraph references 1-320, pages 1-54,  represent separate specific false claims act  allegations made by Relators herein, based upon excerpted information evidencing false certifications and re-certifications  made  to Medicare, billings made to Medicare based thereon, collections  received  from Medicare based thereon, and overpayments from Medicare that were never repaid by MSA to Medicare,  for the respective patient episodes listed in Appendix 6. All 961 Counts averred below in this Second Amended Complaint make specific reference to these 320 separate 60 day episodes, that are hereby incorporated by specific reference as if fully set forth herein.

61.    There are three (3) main false claims act categories averred; with a subsequent specific reference to the aggregate dollar loss  to the United States for purposes of quantifying treble

damages, fines and equitable relief to be imposed upon Defendant, MSA.

## XI.     FALSE CERTIFICATIONS MADE:  UP-CODING ALLEGATIONS

62.     MSA up-coded billing codes for MSA-Winter Park Office patients, by amending proposed treatment plans prepared by licensed clinicians, as originally stated on initial OASIS forms submitted by clinicians to MSA for preparation of CMS Form 485s. Treating physicians did not authorized these up-codes for Medicare billing purposes, but Kristy MaGee, MD did.

63.     Diagnoses, treatments plans and billing codes were modified for purposes of billing Medicare at the MSA-Winter Park Billing Office by Janet Persaud in collusion with MSA Administrator Donna Smargon, from those diagnoses, treatments plans, and services, considered medically necessary, as originally recommended by MSA's patient's treating physicians, and by MSA licensed Clinicians drafting initial OASIS forms for those patients.

64.     MSA Administrator, Donna Smargon and MSA Coder Janet Persaud utilized a computer program, such as PPS Plus, to assess the potential reimbursement of various diagnosis codes pertaining to patients.  These types of programs 'scrub' raw data inputted and show various reimbursements possible by changing codes, sequence of diagnosis codes, changing acuity, number of skilled visits, number of therapy visits, etc..

65.     MSA Administrator, Donna Smargon directed MSA Coder Janet Persaud to organize the diagnosis codes of patients in a certain order, to up-code certain diagnoses to the next higher level related diagnosis code, to insert such things for all patients, such as skilled visits that were not medically necessary, therapy visits that were not medically necessary, or to insert additional diagnoses, such as low vision or vertigo;  so as to obtain the largest reimbursement from Medicare possible.

66.     MSA Administrator Donna Smargon increased recommended skilled nursing and therapy visits recommended by MSA Clinicians preparing initial OASIS documents for patients, thereby arbitrarily increasing plan of care treatment plans indicated on CMS Form 485s to increase Medicare billing related to that plan of care.

67.     Clinicians were handed back plans of care for MSA patients that they neither agreed with, or thought were medically necessary, and knew were up-coded plans of care drafted by MSA's billing office merely to increase billings. These were never approved by MSA clinicians, as required by Medicare regulations, cited as an additional reason why related CMS 485s are false.

68.     Contrary to Medicare regulations, MSA patients plans of care that were up-coded by the MSA billing office were not consistent with the primary reasons for which the patient was to receive home health services, which is a material provision of the certification or re-certification oath stated on CMS Form 485.

69.     MSA Administrator, Donna Smargon Ordered skilled services commensurate with the up-coded diagnoses so that MSA would realize much higher profit margins than HHC industry standards nationally, and in fact, at one point received an award by MSA corporate for having one of the highest profit margins at MSA nationally.

## ILLUSTRATIVE EXAMPLES OF UP CODING WITHIN FALSELY CERTIFIED 485s

70.     Regarding MSA Patient RM, MSA File Number: 242478, (Appendix 6, reference 231, p. 39) for plan of care episode 9/9/10-11/7/10, patient file records OASIS form indicates that the form was modified without RN approval (there is handwriting on the OASIS that is not the handwriting of RN L. McNeil ).  Any diagnosis changes made by MSA Office are supposed to be sent back to RN L. McNeil for approval, as RN L. McNeil prepared that form after an in person

visit with the patient for that purpose. The record indicates that this did not happen as there is no RN approval on the bottom of the form. Functional limitations indicate dyspnea with exertion which means that the patient gets short of breath with moving around. There is no diagnosis or medications to validate dyspnea for RM. Patient RM's CMS Form 485 states "patient leaves home with assistance.." which means that Patient RM is up as tolerated with a walker and a cane. This does not evidence homebound status, as the patient could go out with a walker and a cane to MD appointments, shopping etc. Skilled Nursing CMS Form 485 Orders include "assess for pain level, cardiac and respiratory status". The only medications listed are for blood pressure and pain. The Aspirin 81 mg is ordered daily for blood thinning not pain. RA's treating physician was Ashwinkumar R. Patel. This CMS Form 485 certification was signed by Kristy Magee, MD on 11/4/10. This certification is false and fraudulent pursuant to federal law and Medicare regulations. There is no documentation in RM's patient file documenting low vision and are no drugs being administered for depression but these are diagnoses coded and billed to Medicare for patient RM for this episode.

71.     Further, regarding MSA Patient RM, MSA File Number: 242478, (Appendix 6, reference 231, p. 39) the false CMS 485 certification signed for RM's plan of care episode 9/9/10-11/7/10 was used by MSA as "on file" documentation maintained in RM's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of RM's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 9/30/10, and Medicare paid MSA approximately $1,270.92 ( 60% of the RAP billed of $2,118.20) within a few days thereafter. After the conclusion of RM's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA,

on or after November 7, 2010, and Medicare paid MSA the balance due for RM's 60 day episode of approximately $847.28 (or 40% of BA's final billing of $2,118.20, or the final billing less advance amounts already paid provisionally).

72.    MSA's profit and loss records for RM's episode 9/9/10-11/7/10 reveal that MSA collected $2,118.20 from Medicare, total cost for RM was $1,200, and profit on RM's episode was $918.20 or 43%.

73.    Regarding MSA Patient SL, MSA File Number: 227966, (Appendix 6, reference 226, p. 38) for plan of care episode 4/3/10-6/1/10, Patient SL was diagnosed with Asthma, but there are no drugs or treatments ordered for the Asthma. The Asthma diagnosis was added for billing Medicare. CMS Form 485 states "patient leaves home with assistance for infrequent absences", which means that SL is ambulatory and walks with a cane and can leave the home. SL is not homebound and does not qualify for home health care. SL is diagnosed with low vision with no medical documentation to support this diagnosis, for Medicare billing purposes only. Both occupational therapy and physical therapy were ordered for patient SL, related to a historical fractured wrist. In Florida, occupational therapists do the upper body and physical therapists do the lower body. There is no need for a physical therapist ordered on SL's home health care plan. The physical therapist was added in the plan of care for purposes of billing Medicare only, as there was no medical necessity for a physical therapist ordered in SL's plan of care. Kurt Gasner, MD was SL's treating physician, however, Kristy MaGee, MD signed the CMS Form 485 for this episode on 7/14/10. SL's plan of care certification is false and fraudulent pursuant to federal law and Medicare regulations.

74.    Further, regarding MSA Patient SL, MSA File Number: 227966, (Appendix 6,

reference 226, p.38) the false CMS 485 certification signed for SL's plan of care episode 4/3/10-6/1/10 was used by MSA as "on file" documentation maintained in SL's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of SL's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 5/17/10, and Medicare paid MSA approximately $4,048.18 ( 60% of the RAP billed of $6,746.96) within a few days thereafter. After the conclusion of SL's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 7/14/10, and Medicare paid MSA the balance due for SL's 60 day episode of approximately $2,698.78 (or 40% of SL's final billing of $6,746.96, or the final billing less advance amounts already paid provisionally).

75.     MSA's profit and loss records for SL's episode 4/3/10-6/1/10 reveal that MSA collected $6,746.96 from Medicare, total cost for SL was $3,900.00, and profit on SL's episode was $2,846.96 or 42%.

76.     Regarding MSA Patient MM, MSA File Number: 169279, (Appendix 6, reference 237, p. 40) for plan of care episode 7/18/10-9/15/10, the unsigned Addendum to the CMS Form 485 states "Patient leaves home with assistance for infrequent absences of short duration only". MM is not homebound within Medicare guidelines and is not entitled to home health care. Additionally although MM is diagnosed with vascular dementia for Medicare billing purposes, the front of the form under item 19 mental status states the MM is "oriented" and "forgetful". This does not indicate vascular dementia and MM's home health care file does not support vascular dementia. MM's treating physician is listed as Adrian Burrows, MD, however, MM's plan of care was certified by Kristy MaGee, MD on 9/23/10, after the plan of care was already concluded.

77.    Further, regarding MSA Patient MM, MSA File Number: 169279, (Appendix 6, reference 237, p. 40)  the false CMS 485 certification signed for MM's plan of care episode 7/18/10-9/15/10 was used by MSA as "on file" documentation maintained in MM's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of MM's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 10/31/10, and Medicare paid MSA approximately $1,148.60 ( 50% of the RAP billed of $2,297.20) within a few days thereafter. Thereafter MSA finally billed Medicare's Agent Palmetto GPA, on or after 10/31/10, and Medicare paid MSA the balance due for MM's 60 day episode of approximately $1,148.60 (or 50% of MM's final billing of $2,297.20, or the final billing less advance amounts already paid provisionally).

78.    MSA's profit and loss records for MM's episode 7/18/10-9/15/10 reveal that MSA collected $2,297.20 from Medicare, total cost for MM was $900.00, and profit on MM's episode was $1,397.20, or 61%.

79.    Regarding MSA Patient LP, MSA File Number: 208449, (Appendix 6, references 252-253, p. 43) for plan of care episodes: 5/26/10-7/24/10, and 7/25/10-9/22/10, LP's diagnosis includes "Depressive Disorder Nec", however, LP was not prescribed any psychotropic medication to treat this diagnosis. No patient records from LP's treating physician on file contain any depression diagnosis for LP. "Depressive Disorder Nec" was added to LP's CMS 485 for purposes of billing Medicare by MSA. LP's treating physician is Joshi Sukhinder, MD, however, Kristy MaGee, MD certified these two CMS Form 485s for LP on 9/2/10 and again on 10/7/10, respectively. LP's plan of care certifications signed by Kristy MaGee, MD are false and fraudulent

pursuant to federal law and Medicare regulations.

80. Further MSA Patient LP, MSA File Number: 208449, (Appendix 6, reference 252, p.43) the false CMS 485 certification signed for LP's plan of care episode 5/26/10-7/24/10 was used by MSA as "on file" documentation maintained in LP's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of LP's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 6/30/10, and Medicare paid MSA approximately $1,148.60 ( 50% of the RAP billed of $2,297.20) within a few days thereafter. After the conclusion of LP's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 9/2/10, and Medicare paid MSA the balance due for LP's 60 day episode of approximately $1,148.60 (or 50% of LP's final billing of $2,297.20, or the final billing less advance amounts already paid provisionally).

81. MSA's profit and loss records for LP's episode 5/26/10-7/24/10 reveal that MSA collected $2,297.20 from Medicare, total cost for LP was $900.00, and profit on LP's episode was $1,397.20, or 61%.

82. Further MSA Patient LP, MSA File Number: 208449, (Appendix 6, reference 253, p. 43) the false CMS 485 certification signed for LP's plan of care episode 7/25/10-9/22/10 was used by MSA as "on file" documentation maintained in LP's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of LP's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 9/30/10, and Medicare paid MSA approximately $1,870.56 ( 50% of the RAP billed of $3,741.12) within a few days thereafter. Thereafter, MSA

finally billed Medicare's Agent Palmetto GPA, on or after 10/7/10, and Medicare paid MSA the balance due for LP's 60 day episode of approximately $1,870.56 (or 50% of LP's final billing of $3,741.12, or the final billing less advance amounts already paid provisionally).

83.    MSA's profit and loss records for LP's episode 7/25/10-9/22/10 reveal that MSA collected $3,741.13 from Medicare, total cost for LP was $1,950.00, and profit on LP's episode was $1,791.13, or 48%.

84.    MSA officers and directors at MSA corporate offices in Lexington, South Carolina were aware of the improper up-coding practices being utilized by Administrator, Donna Smargon and Coder Janet Persuad in MSA's Winter Park Office for years. Instead of changing this practice and offering to reimburse Medicare the money MSA was improperly paid, MSA Officers praised Ms. Smargon for her high profit margin realized for the company. Donna Smargon was employed as Administrator Winter Park Office from on or about 11/25/07 through and including 1/25/12, approximately 50 months.

85.    At a National Summit meeting of MSA in 2010, MSA specially recognized Ms. Smargon and another MSA Administrator, Bob Lippert, as outstanding administrators for MSA based on their high profit margins realized for MSA.

86.    Therapy visits were mandated by MSA Administrator, Donna Smargon, regardless of the actual Acuity of the patient, and regardless of what was recommended by MSA Winter Park Clinicians preparing initial OASIS forms for MSA patients, in order to increase Medicare billings, by adding therapy visits in MSA patient's plans of care that were not medically necessary.

87.    Another example of systematic fraud at MSA Winter Park was that the majority of all patients were assigned the same frequency of skilled visits, regardless of the level of Acutity

indicated, as mandated by MSA Administrator, Donna Smargon, regardless of MSA Clinician recommendations on initial OASIS forms. This was ordered to increase profit margin at MSA Winter Park Office, because the more severely acute patients received inappropriately reduced services resulting in the same home health care services as less acute patients.

88. By definition treatment plans made for up-coded diagnoses made for Medicare billing purposes only, represent treatment plans for services that are not medically necessary and not reimbursable by Medicare.

**ILLUSTRATIVE 31 U.S.C. § 3729 FALSE CLAIMS ACT VIOLATIONS**

89. The following specific Appendix 6-Matrix examples are illustrative of false claims act violations pertaining to specific Appendix 6 episodes referenced 1-320. All false claims act violations referenced in Relators' Second Amended Complaint, Appendix 6-Matrix, episode reference numbers 1-320, are repetitive in nature, and are all based upon this data extracted therefrom: a.) false certifications and re-certifications referenced; b.) listed RAP actual billing dates by MSA to Medicare; c.) actual RAP payments received by MSA, based upon 60% for initial patient's plans of care, or 50% for re-certified patient's plans of care, provisionally billed by MSA when related RAPS were dropped; d) final billing false claims for payment or approval dates being, the on or after date-of the later of these two dates listed in Appendix 6-Matrix per episode 1-320, to wit: a.) the episode completion date; or b.) the date the false CMS Form 485 was signed by Kristy MaGee, MD.; and e.) and computation of the final payment received from Medicare, based upon false claims for payment or approval as submitted on UB 04 CMS Form 1450 Certifications claims for final payment. The RAP was always billed provisionally by MSA and paid to MSA by Medicare first, regardless of whether the plan of care was completed prior to any

billings made to Medicare by MSA. MSA always billed Medicare twice, once for the RAP and once for the final. All 961 FCA violations referenced herein are based upon those two sets of dates referenced in Appendix 6-Matrix for episodes 1-320.

90. For instance, to illustrate Appendix 6 data, patient JA, MSA file number 270986, (Appendix 6, 2, p.1) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 1/19/12 for JA's 11/14/11-1/1212 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing JA's CMS Form 485, because Ms. MaGee was not JA's treating physician, had no doctor-patient relationship with JA, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in JA's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of JA's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after November 22, 2011, and Medicare paid MSA approximately $1,916.34 ( 60% of the RAP billed of $3,193.91) within a few days thereafter. After the conclusion of JA's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after January 19, 2012, and Medicare paid MSA the balance due for JA's 60 day episode of approximately $1,277.57 (or 40% of JA's final billing of $3,193.91, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 1/19/12 related to JA's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to JA's final billing.

Medicare paid MSA approximately $1,277.57 for JA's final episode billing, based upon JA's "on file" false CMS 485 signed 1/19/12. On or after 1/19/12, the provisional payment made to MSA on or after 11/22/11 in the amount of $1,916.34, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in JA's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

91.    To further illustrate Appendix 6 data, patient AA, MSA file number 249194, (Appendix 6, reference 3, p. 2) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 7/21/11 for AA's 6/1/11-7/30/11 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing AA's CMS Form 485, because Ms. MaGee was not AA's treating physician, had no doctor-patient relationship with AA, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in AA's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of AA's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after June 22, 2011, and Medicare paid MSA approximately $2,548.55 ( 50% of the RAP billed of $5,097.11) within a few days thereafter. After the conclusion of AA's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after July 21, 2011, and Medicare paid MSA the balance due for AA's 60 day episode of approximately $2,548.55 (or

50% of AA's final billing of $5,097.11, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 7/21/11 related to AA's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to AA's final billing. Medicare paid MSA approximately $2,548.55 for AA's final episode billing, based upon AA's "on file" false CMS 485 signed 7/21/11. On or after 7/21/10, the provisional payment made to MSA on or after 6/22/11 in the amount of $2,548.55, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in AA's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

92. To further illustrate Appendix 6 data, patient BA, MSA file number 216462, (Appendix 6, reference 12, p. 3) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 11/4/10 for BA's 9/17/10-11/15/10 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing BA's CMS Form 485, because Ms. MaGee was not BA's treating physician, had no doctor-patient relationship with BA, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in BA's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of BA's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance

payment on or after September 30, 2010, and Medicare paid MSA approximately $2,641.95 (50% of the RAP billed of $5,283.90) within a few days thereafter. After the conclusion of BA's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after November 15, 2010, and Medicare paid MSA the balance due for BA's 60 day episode of approximately $2,641.95 (or 50% of BA's final billing of $5,283.90, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 11/15/2010 related to BA's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to BA's final billing. Medicare paid MSA approximately $2,641.95 for BA's final episode billing, based upon BA's "on file" false CMS 485 signed 11/4/10. On or after 11/15/10, the provisional payment made to MSA on or after 9/30/10 in the amount of $2,641.95, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in BA's patient file represents a false record or statement material to a false or fraudulent claim, for purposes of 31 U.S.C. § 3729 (B).

93. To further illustrate Appendix 6 data, patient RA, MSA file number 254636, (Appendix 6, reference 17, p. 4) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 4/7/11 for RA's 2/25/11-4/25/11 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing RA's CMS Form 485, because Ms. MaGee was not RA's treating physician, had no doctor-patient relationship with RA, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per

hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in RA's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of RA's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after March 11, 2011, and Medicare paid MSA approximately $ 2,397.05 ( 60% of the RAP billed of $3,995.09) within a few days thereafter. After the conclusion of RA's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 4/25/11, and Medicare paid MSA the balance due for RA's 60 day episode of approximately $1,598.04 (or 40% of RA's final billing of $3,995.09, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 4/25/11 related to RA's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to RA's final billing. Medicare paid MSA approximately $1,598.04 for RA's final episode billing, based upon RA's "on file" false CMS 485 signed 4/7/11. On or after 4/25/11, the provisional payment made to MSA on or after 3/11/11 in the amount of $2,397.05, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in RA's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

94.     To further illustrate Appendix 6 data, patient MA, MSA file number 236080, (Appendix 6, reference 25, p. 5) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified

as true by Kristy MaGee, MD on 10/7/10 for MA's 8/1/10-9/29/10 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing MA's CMS Form 485, because Ms. MaGee was not MA's treating physician, had no doctor-patient relationship with MA, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in MA's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of MA's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 9/29/10, and Medicare paid MSA approximately $ 2,496.11 ( 50% of the RAP billed of $4,992.23) within a few days thereafter. After the conclusion of MA's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 10/7/10, and Medicare paid MSA the balance due for MA's 60 day episode of approximately $2,496.12 (or 50% of MA's final billing of $4,992.23, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 10/7/10 related to MA's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to MA's final billing. Medicare paid MSA approximately $2,496.12 for MA's final episode billing, based upon MA's "on file" false CMS 485 signed 10/7/10. On or after 10/7/10, the provisional payment made to MSA on or after 9/29/10 in the amount of $2,496.11, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in MA's patient file represents a false record or

statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

95.     To further illustrate Appendix 6 data, patient CB, MSA file number 248902, (Appendix 6, reference 38, p. 7) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 1/20/11 for CB's 11/29/10-1/27/11 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing CB's CMS Form 485, because Ms. MaGee was not CB's treating physician, had no doctor-patient relationship with CB, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in CB's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of CB's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 12/15/10, and Medicare paid MSA approximately $ 2,995.34 ( 60% of the RAP billed of $4,992.23) within a few days thereafter. After the conclusion of CB's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 1/27/11, and Medicare paid MSA the balance due for CB's 60 day episode of approximately $1,996.89 (or 40% of CB's final billing of $4,992.23, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 1/27/11 related to CB's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to CB's final billing. Medicare paid MSA approximately $1,996.89 for CB's final episode billing, based upon CB's "on file" false CMS 485 signed 1/20/11. On or after 1/27/11, the provisional payment made to

MSA on or after 12/15/10 in the amount of $2,995.34, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in CB's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

96.     To further illustrate Appendix 6 data, patient KC, MSA file number 257719, (Appendix 6, reference 76, p. 14) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 6/23/11 for KC's 4/14/11-6/12/11 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing KC's CMS Form 485, because Ms. MaGee was not KC's treating physician, had no doctor-patient relationship with KC, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in KC's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of KC's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 4/30/11, and Medicare paid MSA approximately $ 2,799.76 ( 60% of the RAP billed of $4,666.27) within a few days thereafter. After the conclusion of KC's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 6/23/11, and Medicare paid MSA the balance due for KC's 60 day episode of approximately $1,866.51 (or 40% of CB's final billing of $4,666.27, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was

made by MSA to Medicare on UB 04 CMS 1450 on or after 6/23/11 related to KC's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to KC's final billing. Medicare paid MSA approximately $1,866.51 for KC's final episode billing, based upon KC's "on file" false CMS 485 signed 6/23/11. On or after 6/23/11, the provisional payment made to MSA on or after 4/30/11 in the amount of $2,799.76, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in KC's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

97. To further illustrate Appendix 6 data as a last illustrative example, patient LE, MSA file number 237727, (Appendix 6, reference 128, p. 22) : A false and fraudulent "Home Health Certification And Plan Of Care" CMS Form 485 was signed by MSA Administrator, Donna Smargon, and Certified as true by Kristy MaGee, MD on 10/7/10 for LE's 8/24/10-10/22/10 home health care episode. Kristy MaGee, MD was prohibited by federal law from signing LE's CMS Form 485, because Ms. MaGee was not LE's treating physician, had no doctor-patient relationship with LE, and because Ms. MaGee had a compensation agreement with MSA in which Ms. MaGee was paid $250 per hour for work performed. This false CMS 485 certification was used by MSA as "on file" documentation maintained in LE's patient file required by federal law as a mandatory pre-requisite for the final billing Certification made by MSA after conclusion of LE's 60 day episode. Initially, MSA billed Medicare's Agent Palmetto GPA for an initial RAP provisional advance payment on or after 9/13/10, and Medicare paid MSA approximately $1,731.01 ( 50% of the RAP billed of $3,462.03) within a few days thereafter. After the

conclusion of LE's 60 day episode, MSA finally billed Medicare's Agent Palmetto GPA, on or after 10/22/10, and Medicare paid MSA the balance due for LE's 60 day episode of approximately $1,731.02 (or 50% of LE's final billing of $3,462.03, or the final billing less advance amounts already paid provisionally). A false or fraudulent claim for payment or approval, within the meaning of 31 U.S.C. 3729 (A), was made by MSA to Medicare on UB 04 CMS 1450 on or after 10/22/10 related to LE's final billing, as truthful certifications or re-certifications had to be "on file" by MSA prior to LE's final billing. Medicare paid MSA approximately $1,731.02 for LE's final episode billing, based upon LE's "on file" false CMS 485 signed 10/7/10. On or after 10/22/10, the provisional payment made to MSA on or after 9/13/10 in the amount of $1,731.01, became an obligation due to the United States within the meaning of 31 U.S.C. § 3729 (a)(1)(G), as advance funds received from the United States that MSA was not entitled to. The false certification CMS Form 485 itself executed for "on file" documentation maintained by MSA in LE's patient file represents a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729 (B).

98.     Appendix 6-Matrix sets forth with specificity all dates that RAPs were dropped and all, on or after dates, that final billings/false claims were made by MSA Lexingon, South Carolina, on UB 04 CMS Form 1450 Claims For Payment that were dropped on Medicare's Agent Palmetto GBA.

99.     As previously stated, final billings/false claims were made on or after the latest of: a.) the date signed by Kristy MaGee, MD; or b.) the end of episode date, whichever date is later as delineated on Appendix 6 for references 1-320.

100.     All episode 1-320 billings specifically enumerated by dollar amount on Appendix 6

were actually billed to Medicare by MSA Lexington South Carolina and collected from Medicare by MSA Lexington South Carolina.

**COUNTS 1-320, INCLUSIVE**
**VIOLATION OF 31 U.S.C. § 3729 (a)(1)(A)**
**FALSE OR FRAUDULENT CLAIM MADE TO THE UNITED STATES**
**FOR PAYMENT OR APPROVAL**
**(After May 20, 2009)**

101.    Relators adopt and reallege in Counts 1-320 the allegations contained in paragraphs 1. through 100. above, and Appendices 1-6, as if fully set forth herein.

102.    Beginning on or about May 1, 2010, continuing through and including, on or about February 28, 2012, Defendant, MSA, knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to Palmetto GBA, Agent for Medicare home health care administration for Florida, via electronic submission of UB 04 CMS 1450 forms for MSA patients being finally billed to Medicare, for which CMS 485 certifications or re-certifications were certified by Kristy MaGee, MD, MSA's Medical Director, as opposed to patients' treating physicians, thereby making the 485 certifications or re-certifications false certifications for final Medicare billing UB 04 CMS Form 1450 purposes under federal law and Medicare regulations.

103.    Said false or fraudulent claims for payment approval that Defendant presented, or caused to be presented to Medicare were made with actual knowledge of the falsity of the information used , were made acting in deliberate ignorance of the truth or falsity of the information used, or were made acting in reckless disregard of the truth or falsity of the information used.

104.    MSA made 320 false or fraudulent claims for payment or approval to Medicare's Agent Palmetto GBA, as delineated in Appendix 6-Matrix, episode reference numbers 1-320 and contained on pages 1-54 therein, and from which Counts 1-320 here are comprised.

105. These 320 separate false or fraudulent claims made for payment or approval by MSA included both: a.) final false claims made for approval of patients' entire billing listed in Appendix-6 Matrix, for total dollar amounts listed, respectively; and b.) false claims made for payment or approval for balances due related to the same specific patient episodes being finally billed therewith, at 40% of RAP for initially certified patients listed, or 50% of RAP for patients re-certified listed, or total final invoice billed less total RAP payments previously made provisionally by Medicare to MSA.

106. Relators aver one false claims act violation of 31 U.S.C. § 3729 (a)(1)(A) per patient episode reference number 1-320 as contained in Appendix-6, respectively, hereby incorporated by specific reference as if fully set forth herein.

107. MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for each of Counts 1-320, or minimum penalties of $3,449,920.00 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 1-320.

WHEREFORE, Plaintiffs'/Relators' demand judgment against Defendant, MSA, for civil penalties of not less than $10,781 for each of Counts 1-320, three (3) times the amount of actual damages that the Government sustained because of Defendant's acts, reasonable expenses incurred, plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

## COUNTS 321-640, INCLUSIVE
## VIOLATION OF 31 U.S.C. § 3729 (a)(1)(B)

## FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS PRESENTED FOR PAYMENT OR APPROVAL
### (After May 20, 2009)

108.    Relators adopt and reallege in Counts 321-640 the allegations contained in paragraphs 1. through 100. above, and Appendices 1-6, as if fully set forth herein.

109.    Beginning on or about May 1, 2010, continuing through and including, on or about February 28, 2012, Defendant, MSA, knowingly made, used, or caused to be made or used, false records or false statements material to false or fraudulent claims presented, or caused to be presented for payment or approval, to Palmetto GBA, Agent for Medicare home health care administration for Florida, that were false final Certifications presented to Medicare with UB 04 CMS 1450 final claims for payment or approval made; and 320 separate false "Home Health Certification And Plan Of Care" CMS 485 certifications or re-certifications, certified as true by Kristy MaGee, MD, MSA's Medical Director, as opposed to patients' treating physicians, that are mandatory "on file" pre-requisites to the aforementioned final billing Certifications, for final Medicare billing UB 04 CMS Form 1450 purposes under federal law and Medicare regulations.

110.    These 320 separate false or fraudulent claims made for payment or approval by MSA included both: a.)    final false claims made for approval of patients' entire billing listed in Appendix-6 Matrix, for total dollar amounts listed, respectively; and b.) false claims made for payment or approval for balances due related to the same specific patient episodes being finally billed therewith, at 40% of RAP for initially certified patients listed, or 50% of RAP for patients re-certified listed, or total final invoice billed less total RAP payments previously made provisionally by Medicare to MSA.

111.    Relators aver one false claims act violation of 31 U.S.C. § 3729 (a)(1)(B) per patient episode reference number 1-320 as contained in Appendix-6, respectively, hereby incorporated by specific reference as if fully set forth herein.

112.    Said false records or false statements material to false or fraudulent claims presented, or caused to be presented for payment or approval, to Palmetto GBA, were made with actual knowledge of the falsity of the information used , were made acting in deliberate ignorance of the truth or falsity of the information used, or were made acting in reckless disregard of the truth or falsity of the information used.

113.    MSA made 320 false records or false statements material to false or fraudulent claims presented, or caused to be presented for payment or approval, to Palmetto GBA, as delineated in Appendix 6-Matrix, episode reference numbers 1-320 and contained on pages 1-54 therein, and from which Counts 321-620 here are comprised..

114.    MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for each of Counts 321-620, or minimum penalties of $3,449,920.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 1-320.

WHEREFORE, Plaintiffs'/Relators' demand judgment against Defendant, MSA, for civil penalties of not less than $10,781 for each of Counts 321-620, three (3) times the amount of actual damages that the Government sustained because of Defendant's acts, reasonable expenses incurred, plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

**COUNTS 641-960, INCLUSIVE**
**VIOLATION OF 31 U.S.C. § 3729 (a)(1)(G)**
**CONCEALS OR AVOIDS OBLIGATIONS TO REPAY THE UNITED STATES**
**(After May 20, 2009)**

115.   Relators adopt and reallege in Counts 641-960 the allegations contained in paragraphs 1. through 100. above, and Appendices 1-6, as if fully set forth herein.

116.   Beginning on or about May 1, 2010, continuing through and including, the present date, Defendant, MSA, knowingly made, used, or caused to be made or used, false records or false statements material to an obligation to pay or transmit money to the Government, or knowingly concealed or knowingly and improperly avoided or decreased 320 separate obligations to pay or transmit money to the Government.

117.   Requests for anticipated payments (RAPs) made by MSA for episodes listed in Appendix 6, episode reference numbers 1-320 resulted in 320 provisional advance payments made by Medicare to MSA Lexington South Carolina for these patient episodes, contingent upon final billing UB04 CMS Form 1450 Certifications, based upon truthful CMS 485 certifications or re-certifications being maintained "on file" for these patients finally billed to Medicare's Agent Palmetto GPA.

118.   The 320 RAP advance payments received by MSA Lexingon, South Carolina, became obligations to repay the United States, within the meaning of 31 U.S.C. § 3729 (a)(1)(G) on the same dates these final patient episodes were billed to Medicare, as truthful CMS Form 485s must have existed "on file", pursuant to federal law and Medicare regulations, prior to patients' final home health care billings to Medicare by MSA, as referenced in Appendix 6, episode reference

numbers 1-320.

119.    The false 320 final Certifications presented to Medicare with UB 04 CMS 1450 for final episode billing submitted for Appendix 6, episode reference numbers 1-320, also represent false Certification statements, knowingly made, material to an obligation to pay or transmit money to the Government, or made to knowingly conceal or to knowingly and improperly avoid or decrease paying back 320 separate obligations to pay or transmit money to the United States for advanced funds that MSA was not entitle.

120.    Said false records or false statements material to obligations to pay or transmit money to the Government, or to knowingly conceal or knowingly and improperly avoid or decrease 320 separate obligations to pay or transmit money to the Government, for the 320 advance RAP payments received by MSA, as delineated in Appendix 6, episode reference numbers 1-320, were made with actual knowledge of the falsity of the information used, or were made acting in deliberate ignorance of the truth or falsity of the information used, or were made acting in reckless disregard of the truth or falsity of the information used.

121.    MSA made 320 false records or false statements to knowingly conceal or knowingly and improperly avoid or decrease 320 separate obligations to pay or transmit money to the Government, as delineated in Appendix 6, episode reference numbers 1-320, and contained on pages 1-54 therein, and comprising Counts 621-960, inclusive.

122.    Relators aver one false claims act violation of 31 U.S.C. § 3729 (a)(1)(G) per patient episode reference number 1-320 as contained in Appendix-6, respectively, hereby incorporated by specific reference as if fully set forth herein.

123.    MSA is liable is to the United States Government for a civil penalty of not less than

$10,781 and not more than \$21,563, for each of Counts 641-960,    or minimum penalties of \$3,449,920.00,  as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Counts 1-320.

WHEREFORE,  Plaintiffs'/Relators' demand judgment against Defendant, MSA, for civil penalties of not less than \$10,781 for each of Counts 321-620, three (3) times the amount of actual damages that the Government sustained because of Defendant's acts,  reasonable expenses incurred,  plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

### COUNT  961
### VIOLATION  OF  31  U.S.C.  §  3729 (a)(1)(C)
### CONSPIRACY TO VIOLATE 31 U.S.C. § 3729 (a)(1)(A)(B)(G)
**(After May 20, 2009)**

124.  Relators adopt and reallege in Count 961 the allegations contained in paragraphs 1. through 100. above, and Appendices 1-6, as if fully set forth herein.

125.    Beginning on or about May 1, 2010, continuing through and including, on or about February 28, 2012, two or more persons employed by MSA Lexington, South Carolina, to wit: MSA Winter Park Administrator Donna Smargon, and MSA Winter Park Coder/Biller Janet Persaud, and MSA Medical Director, Kristy MaGee, MD,  conspired, combined and confederated, to commit violations of 31 U.S.C. § 3729 (a)(1)(A),(B), and (D) for MSA, for the purpose of unlawfully increasing Medicare billings, as delineated in Appendix 6, patient episode reference numbers 1-320,  through the creation and use of false and fraudulent CMS Form 485 MSA patients' plans of care, and falsely or fraudulently Certified CMS Form 485s containing false or fraudulent

Certifications, diagnosis codes billed to Medicare that were either added not withstanding that they were not medically necessary, or up-coded from lesser diagnosis codes; all of which were not lawfully billed to Medicare under federal law and Medicare regulations.

126. MSA Coder/Biller Janet Persaud was not an experienced or licensed Medicare biller/coder and did what she was told my MSA Administrator Donna Smargon. Likewise, Kristy MaGee, MD did what she was told by MSA Administrator Donna Smargon and signed MSA patient CMS Form 485s certifying under oath that Ms. MaGee were those patients were under her care, meaning that Ms. MaGee was those patients' primary care physician, when in fact Ms. MaGee was not. Both Ms. MaGee and Ms. Persaud knew what they were doing was wrong. MSA Administrator Donna Smargon could not violate 31 U.S.C. § 3729 (a)(1)(A), (B), or (D) without substantial assistance received from both Ms. MaGee and Ms. Persaud to violate these false claims act provisions.

127. Relator Jan Watford Granger, and numerous other MSA Clinicians knew that there was a conspiracy at MSA Winter Park to unlawfully increase Medicare billings and profit margins for all home health care patients under MSA Winter Park's care, through activities contrary to federal law and Medicare regulations related to falsely Certified "on file" CMS Form 485 certifications or re-certifications supporting the falsely or fraudulently prepared and executed plans of care for MSA patients throughout that period.

128. Officers and Directors of MSA Lexington South Carolina either had actual knowledge of this conspiracy at MSA's Winter Park Office, acted in deliberate ignorance it, or acted in reckless disregard of it, and billed Medicare anyway, notwithstanding that those billings for episodes delineated in Appendix 6, patient episode reference numbers 1-320 should

have never resulted in billings or claims for payment or approval made from MSA's Lexington South Carolina Office to Medicare for those patients.

129. MSA is liable is to the United States Government for a civil penalty of not less than $10,781 and not more than $21,563, for Count 961 as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the United States sustained as a result of Count 961.

WHEREFORE, Plaintiffs'/Relators' demand judgment against Defendant, MSA, for civil penalties of not less than $10,781 for Count 961, three (3) times the amount of actual damages that the Government sustained because of Defendant's acts, reasonable expenses incurred, plus reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730 (d)(2), and such other relief as may be deemed equitable and just under the circumstances.

_____

## <u>DEMAND   FOR   JURY   TRIAL</u>

Plaintiffs'/Relators' in the above-styled cause demand a trial by jury of all issues triable as a matter of right in Counts 1 through 961.

**Dated this 13ᵗʰ day of March, 2017.**

**Respectfully submitted,**

**JOSEPH J. PAPPACODA, PA**

*/s/ Joseph J. Pappacoda*

**JOSEPH J. PAPPACODA, ESQUIRE**
**P.O. Box 551498**
**Fort Lauderdale, Florida 33355**
**Florida Bar Number: 883018**
**(954) 560-2616**
**joepappacoda@aol.com**
**USFraudCases.com**

**APPENDICES       1-6 Attached Hereto And Incorporated By Specific Reference To Counts 1-961**